# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KURT BITTNER<br>73 College Ave.<br>Flourtown, PA 19031<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>PANASONIC CORPORATION OF<br>AMERICA<br>Two Riverfront Plaza<br>Newark, NJ 07102<br><br>　　　　Defendant. | CIVIL ACTION<br><br>No. _____ |

## CIVIL ACTION COMPLAINT

Plaintiff, by and through his undersigned counsel, hereby avers as follows:

### INTRODUCTION

1. This action has been initiated by Kurt Bittner (hereinafter referred to as "Plaintiff," unless indicated otherwise) against Panasonic Corporation of North America (hereinafter referred to as "Defendant," unless indicated otherwise) for violations of the Americans with Disabilities Act ("ADA" - 42 USC §§ 12101 *et. seq.*), the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §§ 2601 *et seq.*), the Age Discrimination in Employment Act ("ADEA" - 29 U.S.C. §§ 621 *et. seq.*), Title VII of the Civil Rights Act of 1964 ("Title VII - 42 U.S.C. §§ 2000d *et. seq.*), and the New Jersey Law Against Discrimination ("NJ LAD" - N.J.S.A. 10:5-1, *et. seq.*). As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

### JURISDICTION AND VENUE

2. This Court, in accordance with 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claims because this civil action arises under laws of the United States.

3. This Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945) and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and in addition, Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of the District of New Jersey.

5. Plaintiff is proceeding herein (in part) under the ADA, ADEA, and Title VII and has properly exhausted his administrative remedies with respect to such claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety (90) days of receiving a notice of dismissal and/or right to sue letter from the EEOC.

## PARTIES

6. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7. Plaintiff is an adult individual, with an address as set forth in the caption.

8. Defendant is a corporation headquartered at the above-caption address that offers (*inter alia*) unified business communications, mobile computing, as well as solutions for security and public safety, retail point-of-sale, industrial automation and professional audio and visual systems.

9. At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

10. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11. Plaintiff is 50 years old.

12. Plaintiff was hired by Defendant in or about July of 2012 as an Area Sales Manager.

13. As a result of his strong work ethic and stellar performance, Plaintiff was promoted to a Senior Territory Account manager in or about April of 2017.

14. Approximately 18 months before his termination from Defendant, Plaintiff began being supervised by National Sales Manager – Kyle Kaiser (approximately 38 years old – hereinafter "Kaiser").

15. Kaiser was supervised by Alexander Nollmann (Director – hereinafter "Nollmann"), who reported to Magnus McDermitt (Vice President – hereinafter "McDermitt").

16. Shortly after coming under the supervision of Kaiser, Plaintiff began being subjected to sexual harassment by Kaiser.

17. For example, but not intending to be an exhaustive list:

    i. Kaiser told Plaintiff that he wanted to take him to a gay bar and that he was going to "teach [Plaintiff] the way."

    ii. Kaiser invited Plaintiff to live in his house and specifically stated that Plaintiff could live in his apartment upstairs.

    iii. Kaiser regularly told Plaintiff that his partner found Plaintiff to be attractive.

   iv. Kaiser told Plaintiff on one occasion that he had a wager with his partner and that if he lost, Kaiser would have to "be the bottom."

   v. Kaiser shared private information about another employee with Plaintiff – specifically informing Plaintiff that this individual was gay.

18. Plaintiff consistently objected to what he reasonably believed to be sexual advances made by Kaiser and made it well known that he was not interested in any of Kaiser's propositions and was uncomfortable with the same.

19. Following Plaintiff's rejection of Kaiser's advances, Kaiser began to subject Plaintiff to hostility and animosity, including but not limited to treating him in a rude and condescending manner, holding him to different standards than other employees, and selectively enforcing policies against him.

20. In addition to the inappropriate sexual conduct that Plaintiff was subjected to by Kaiser and the retaliatory treatment that stemmed from his rejections and objections to the same, Plaintiff asserts that he was also subjected to hostility, animosity and discrimination based on his age and later, his disability, as described more fully *infra*.

21. For example, towards the end of Plaintiff's employment with Defendant he was (1) given more difficult quotas than some of his younger colleagues; (2) not provided with quota reductions like his younger colleagues, despite his requests for the same; (3) denied a promotion in favor of a younger individual; (4) not held to the same standards as his younger co-workers; and (5) had policies, goals, an other requirements selectively enforced against him.

22. Between December of 2020 and April of 2021, Plaintiff was extremely ill and was diagnosed with an autoimmune disease, which resulted in significant health complications and

limited Plaintiff's ability, on occasion, to engage in daily life activities, such as walking, standing, and performing manual tasks.

23. Plaintiff took intermittent days off as a result of his aforesaid diagnosis (because some days he was bedridden due to the same). However, because of Plaintiff's vast workload, he continued to try to work from home during this period even though his health was suffering.

24. Shortly after apprising Defendant's management about his aforesaid health condition, Plaintiff was provided with a negative performance review on or about April 26, 2021, which was followed by his ***first ever*** Performance Improvement Plan ("PIP").

25. Plaintiff's performance review was riddled with errors, lies, and inaccurate information and he felt completely blindsided.

26. Plaintiff believes and therefore avers the aforesaid negative performance review and PIP were used to create a paper trail on him in order to try and expedite his termination.

27. Plaintiff expressed his concerns about the performance review and PIP to Defendant's management, including but not limited to Nollman and Semyon Lazerson – (Human Resources Business Partner – hereinafter "Lazerson").

28. Specifically, on May 5, 2021, Plaintiff emailed Lazerson, stating:

> I wanted to touch base with you. I met with Alex Nollmann this morning and shared with him my shock to the performance review I was given. When Kyle shared his input last week he told me I would be put on a Performance Improvement Plan. I have some documentation and items I would like to discuss prior to this. Do you have time later this week to discuss how I can properly document this information?

29. Lazerson responded to Plaintiff's email stating: "Thanks for reaching out. We can meet and discuss your concerns. Please feel free to schedule a meeting, I have free time in the afternoon later this week."

30. During Plaintiff's discussions with Lazerson about his performance review (following his May 5, 2021 email), he also expressed concerns of Kaiser's previous sexual harassment, but this concern was never investigated by Lazerson.

31. On or about June 1, 2021, Plaintiff escalated his concerns about the aforesaid performance review and the PIP to Defendant's Ethics Committee, which was allegedly investigated by Ken Portington (Director of Human Resources – hereinafter "Portington").

32. In connection with his Ethics complaint (discussed *supra*), Plaintiff expressed verbally that he believed that he was being subjected to age discrimination and gave examples of the same, discussed above.

33. Defendant asserts that it has no record of Plaintiff complaining of age discrimination and highlights that his written ethics complaint never used the words "age discrimination."

34. However, Plaintiff specifically stated in his written complaint that he was being subjected to "discrimination" and while allegedly investigating Plaintiff's complaint, Portington spoke to Plaintiff and asked him what type of protected category he thought he was being discriminated against under, to which Plaintiff informed Portington that he believed it was "age."

35. Plaintiff was also later told by Portington that his aforesaid complaint did not fit "traditional age discrimination."

36. Following Plaintiff's aforesaid complaint of age discrimination, Defendant's management began to subject him to even further discrimination and retaliation. For example,

Defendant's management began to isolate Plaintiff from team events and meetings, including but not limited to being told to back out of a FDNY Charity dinner by Nollmann, not permitting him to attend a trade show in Orlando, Florida in July of 2021, and inviting him to PSI meetings but then telling him not to attend those meetings.

37. Following his aforesaid complaint of discrimination, Plaintiff was told by Portington that while there were errors found in his review, there was no finding of "traditional age discrimination" and his PIP was permitted to officially commence on July 1, 2021.

38. Despite the aforesaid animosity and hostility that Plaintiff was being subjected to, he continued to work to the best of his ability and believed he was doing everything Defendant's management had asked of him under the PIP, even though Defendant's management were not living up to their promises under the PIP and had selectively enforced certain standards/goals against him.

39. In or about September of 2021, Kaiser extended Plaintiff's PIP by another month.

40. The reasons for Plaintiff's aforesaid PIP extension are simple: (1) Kaiser and HR did not meet with Plaintiff per the guidelines of the initial 60-day PIP; (2) Kaiser wanted to use Plaintiff to finalize a 7.5-million-dollar contract before ultimately terminating his employment; and (3) it was clearly being used as a means to justify his later termination (discussed *infra*).

41. On or about October 24, 2022, the day that the aforesaid 7.5-million-dollar contract was supposed to be signed, Plaintiff was terminated from his employment (one week prior to the end of the one month extension on his PIP), citing performance as the reason.

42. Based on the foregoing, Plaintiff's believes and avers that his termination was completely pretextual and that he was really given a negative performance evaluation, placed on a

PIP, had his PIP extended, and ultimately terminated his employment in violation of the ADA, FMLA, ADEA, and Title VII.

**COUNT I**
**Violations of the Americans with Disabilities Act, as amended ("ADA")**
**[1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation; [3] Hostile Work Environment)**

43. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

44. Plaintiff suffered from qualifying health conditions under the ADA (as amended), which (at times) affected his ability to perform some daily life activities – discussed *supra*.

45. Plaintiff requested reasonable accommodations under the ADA, including intermittent time off from work. However, because of Plaintiff's vast workload, he continued to try to work from home during this period even though his health was suffering.

46. Shortly after apprising Defendant's management about his aforesaid health condition and need for minor accommodations, Plaintiff was subjected to a hostile work environment, including but not limited to being provided with his first ever negative performance review on or about April 26, 2021, followed by his first ever PIP, which was extended in or about September of 2021.

47. On or about October 24, 2021, Plaintiff was ultimately terminated from his employment with Defendant for completely pretextual reasons.

48. Plaintiff believes and therefore avers that his known disabilities, perceived disabilities; and/or his record of impairment were motivating or determinative factor[s] in Defendant's decisions to give him a negative performance review, place him on a PIP, extend his PIP and ultimately terminate his employment.

49. Plaintiff also believes and therefore avers that he was given a negative performance review, placed on a PIP, had his PIP extended, and was ultimately terminated from Defendant because of his protected activity under the ADA (which constitutes unlawful retaliation).

50. These actions as aforesaid constitute violations of the ADA, as amended.

## COUNT II
### Violations of the New Jersey Law Against Discrimination ("NJ LAD")
**[1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation; [3] Hostile Work Environment)**

51. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

52. Plaintiff re-asserts and re-alleges each and every allegation as set forth in COUNT I of the instant Civil Action Complaint, as such actions constitute identical violations of the NJ LAD.

## COUNT III
### Family and Medical Leave Act ("FMLA")
**(Interference and Retaliation)**

53. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

54. Plaintiff was an eligible employee under the definitional terms of the FMLA, 29 U.S.C. § 2611(a)(i)(ii).

55. Plaintiff requested intermittent leave from Defendant, his employer, with whom he had been employed for at least twelve months pursuant to the requirements of 29 U.S.C.A § 2611(2)(i).

56. Plaintiff had at least 1,250 hours of service with the Defendant during his last full year of employment (pre-FMLA-qualifying leave request).

57. Defendant is engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A § 2611(4)(A)(i).

58. Plaintiff was entitled to receive leave pursuant to 29 U.S.C.A § 2612 (a)(1) for a total of twelve (12) work weeks of FMLA on a block or intermittent basis.

59. Defendant committed interference and retaliation violations of the FMLA by *inter alia*: (1) considering Plaintiff's FMLA-qualifying intermittent leave/needs in making the decisions to give him a negative performance review, place him on a PIP, extend his PIP and ultimately terminate his employment; (2) giving Plaintiff a negative performance review, placing him on a PIP, extending his PIP, and ultimately terminating his employment in retaliation for requesting and/or utilizing FMLA-qualifying leave; (3) giving Plaintiff a negative performance review, placing him on a PIP, extending his PIP, and ultimately terminating his employment in order to intimidate and/or prevent him from using FMLA-qualifying leave in the future; and/or (4) taking actions towards Plaintiff that would dissuade a reasonable person from exercising his rights under the FMLA.

60. These actions as aforesaid constitute both interference and retaliation violations of the FMLA.

**COUNT IV**
**Violations of the Age Discrimination in Employment Act ("ADEA")**
**([1] Age Discrimination; [2] Retaliation; & [3] Hostile Work Environment)**

61. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

62. Plaintiff believes and avers that he was subjected to a hostile work environment, given a negative performance review, placed on a PIP, had his PIP extended, and was ultimately terminated from Defendant because of his advanced age.

63. Plaintiff believes and also avers that he had his PIP extended and was ultimately terminated from his employment with Defendant for engaging in protected activity under the ADEA.

64. These actions as aforesaid constitute unlawful retaliation under the ADEA.

## COUNT V
### Violations of the New Jersey Law Against Discrimination ("NJ LAD")
([1] Age Discrimination; [2] Retaliation; & [3] Hostile Work Environment)

65. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

66. Plaintiff re-asserts and re-alleges each and every allegation as set forth in COUNT IV of the instant Civil Action Complaint, as such actions constitute identical violations of the NJ LAD.

## COUNT VI
### Violations of the Title VII of the Civil Rights Act of 1964 ("Title VII")
(*Quid-Pro Quo* & Retaliation)

67. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

68. Plaintiff believes and avers that he was subjected to a hostile work environment, given a negative performance review, placed on a PIP, had his PIP extended, and was ultimately terminated because he objected to and refused Kaiser's sexual advances.

69. Plaintiff believes and avers that he was subjected to a hostile work environment, had his PIP extended, and was ultimately terminated because he complained of what he reasonable

believed were sexually inappropriate advances/comments by Kasier to Defendant's HR department.

70. These actions as aforesaid constitute violations of Title VII.

## COUNT VII
### Violations of the New Jersey Law Against Discrimination ("NJ LAD")
(*Quid-Pro Quo* & Retaliation)

71. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

72. Plaintiff re-asserts and re-alleges each and every allegation as set forth in COUNT VI of the instant Civil Action Complaint, as such actions constitute identical violations of the NJ LAD.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority.

B. Plaintiff is to be awarded punitive and/or liquidated damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

C. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering);

D. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: _____
Ari R. Karpf, Esq.
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: September 9, 2022